**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Nos. 25-3059, 25-3074, 25-3076, 25-3078 & 25-3093

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN EARLE SULLIVAN, HECTOR VARGAS SANTOS, STACY WADE
HAGER, BRUNO CUA, and DEREK KINNISON,

*Defendants-Appellants.*

───────────────

CONSOLIDATED APPEALS FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

═══════════════════════

**BRIEF OF APPOINTED *AMICUS CURIAE*
IN SUPPORT OF THE JUDGMENTS BELOW**

═══════════════════════

CATHERINE E. STETSON
MADELYN FORBES*
LANCE J. LEDET, JR.*
ALEKSANDER MEHTA*
ANDREW ODELL*
ALEX E. WEBB*
  * *Third Year Law Student*
APPELLATE LITIGATION CLINIC
UNIVERSITY OF VIRGINIA SCHOOL OF LAW
*580 Massie Road*
*Charlottesville, Virginia 22903*
*(202) 701-4925*
*cate.stetson@law.virginia.edu*

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), amicus curiae hereby states as follows:

**<u>Parties and Amici</u>**

All parties, intervenors, and amici appearing before the District Court and in this Court are listed in the Joint Brief for Appellants Sullivan, Hager, Cua, and Kinnison. Joint Br. 2.

**<u>Rulings Under Review</u>**

References to the rulings at issue appear in the Joint Brief for Appellants and the Brief for Appellant Vargas. Joint Br. 2–3; Vargas Br. i.

**<u>Related Cases</u>**

Appellants' cases have each previously been on direct appeal to this Court. See Order, *United States v. John Earle Sullivan*, No. 24-3051 (D.C. Cir. Feb. 27, 2025); Order, *United States v. Hector Emmanuel Vargas Santos*, No. 23-3059 (D.C. Cir. Feb. 4, 2025); Order, *United States v. Stacy Wade Hager*, No. 23-3130 (D.C. Cir. Feb. 3, 2025); Order, *United States v. Bruno Joseph Cua*, No. 23-3137 (D.C. Cir. Feb. 27, 2025); and Order, *United States v. Eric Scott Walker & Derek Kinnison*, Nos. 24-3046 & 24-3047 (D.C. Cir. Feb. 11, 2025).

Other judges in this District have addressed the same issues presented here regarding motions for reimbursement for individuals convicted for January-6-related crimes but subsequently pardoned while their convictions were pending on appeal.

ii

*See United States v. Ballenger,* 811 F. Supp. 3d 123 (D.D.C. 2025); *United States v. St Cyr,* 804 F. Supp. 3d 1 (D.D.C. 2025); *United States v. Sutton*, No. 21-cr-00598, 2025 WL 2149396 (D.D.C. July 15, 2025).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ vi

GLOSSARY................................................................................... xi

ISSUES PRESENTED.................................................................... xii

STATUTES AND REGULATIONS ................................................. xiii

INTRODUCTION ...........................................................................1

STATEMENT OF THE CASE ...........................................................3

   I.   FACTUAL BACKGROUND.....................................................3

   II.   PROCEDURAL HISTORY ......................................................6

SUMMARY OF ARGUMENT ..........................................................11

ARGUMENT ................................................................................16

   I.   THE DISTRICT COURT HAD JURISDICTION TO ISSUE THE
       CHALLENGED ORDERS.....................................................16

   II.   THE INDIVIDUAL APPELLANTS HAVE NO RIGHT TO A REFUND
       OF THE CRIMINAL PENALTIES THEY PAID ........................18

     A.  Vacatur Cannot Provide the Basis for the Right .........................19

     B.  The Pardons Did Not Give Appellants a Right To Refunds ......................25

       1. *Not from the pardon itself* ...................................................26

       2. *Not from* Nelson ...............................................................27

       3. *Not from* Hewitt................................................................28

       4. *Not from Some Equitable Penumbra*.........................................31

   III.  THE CONSTITUTION BARS ANY REFUND ABSENT
       CONGRESSIONAL APPROPRIATION .....................................35

     A.  The Judgment Fund ..............................................................37

     B.  The Little Tucker Act............................................................37

       1. The Little Tucker Act Supplies Jurisdiction Over Claims For Violation of
          the Constitution, A Statute, Or A Regulation............................38

       2. Appellants' Cases Are Inapposite .........................................43

     C.  31 U.S.C. Section 1322(b)(2)................................................45

     D.  28 U.S.C. Section 2465 .........................................................47

　　E.　Equitable Principles Do Not Circumvent the Need for an Appropriation ..49

CONCLUSION ...................................................................................................51

CERTIFICATE OF COMPLIANCE...................................................................52

CERTIFICATE OF SERVICE ...........................................................................53

# TABLE OF AUTHORITIES

**Cases:**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)..........................................................26

*Army & Air Force Exchange Service v. Sheehan*, 456 U.S. 728 (1982) .......... 38, 39

*Atlantic Coast Line R. Co. v. Florida*, 295 U.S. 301 (1935) ..................................32

*Bank of the United States v. Bank of Washington*, 31 U.S. (6 Pet.) 8 (1832)..........42

*Bowen v. Massachusetts*, 487 U.S. 879 (1988).......................................................33

*Burdick v. United States*, 236 U.S. 79 (1915)........................................................32

*Burrell v. United States*, 384 F.3d 22 (2d Cir. 2004)..............................................30

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ...................48

*Clapp v. United States*, 117 F. Supp. 576 (Ct. Cl. 1954)........................................41

*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984) .......................... 40, 44

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) .............................20

*Cortes v. NLRB*, 145 F.4th 57 (D.C. Cir. 2025)............................................... 17, 18

*Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed. Cir. 2000)..............41

*DeCecco v. United States*, 485 F.2d 372 (1st Cir. 1973)........................................44

*Duarte v. United States*, 532 F.2d 850 (2d Cir. 1976)............................................44

*Eastport Steamship Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967) .............41

*Egbert v. Boule*, 596 U.S. 482 (2022)............................................................. 26, 50

*Ellis v. Railway Clerks*, 466 U.S. 435 (1984)................................................... 20, 24

*Ex parte McCurley*, 412 So.2d 1236 (Ala. 1982). .................................................34

*Feathergill v. United States*, 217 Ct. Cl. 24 (Ct. Cl. 1978) ...................................45

*Hernandez v. Mesa*, 589 U.S. 93 (2020)...............................................................50

*Hewitt v. United States*, 606 U.S. 419 (2025).................................. 28, 29, 30, 34, 47

*In re North*, 62 F.3d 1434 (D.C. Cir. 1994)....................................... 28, 36

*INS v. Pangilinan*, 486 U.S. 875 (1988) .................................................49

*Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017)..........................22

*Kizas v. Webster*, 707 F.2d 524 (D.C. Cir. 1983)....................................41

*Knote v. United States*, 10 Ct. Cl. 397 (1874) ......................................27

*Knote v. United States*, 95 U.S. 149 (1877)............................... 2, 5, 6, 8, 36

*Lee v. United States*, 33 Fed. Cl. 374 (1995)........................................46

*Lorance v. Commandant, U.S. Disciplinary Barracks*,
13 F.4th 1150 (10th Cir. 2021) ....................................................... 20, 24

*Muskrat v. United States*, 219 U.S. 346 (1911) .....................................16

*Nakell v. Att'y Gen. of N.C.*, 15 F.3d 319 (4th Cir. 1994) ............... 21, 24

*Neely v. United States*, 546 F.2d 1059 (3d Cir. 1976) ............................44

*Nelson v. Colorado*, 581 U.S 128 (2017) ................................... 5, 27, 32

*NLRB v. Constellium Rolled Prods. Ravenswood, LLC*,
43 F.4th 395 (4th Cir. 2022) ........................................................... 17, 18

*Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005).....................41

*Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193 (2009) ................19

*Nw. Fuel Co. v. Brock*, 139 U.S. 216 (1891).........................................34

*Office of Personnel Management v. Richmond*,
496 U.S. 414 (1990)................................................... 15, 36, 37, 39, 49

*Osborn v. United States*, 91 U.S. 474 (1875) .......................................26

*Pasha v. United States*, 484 F.2d 630 (7th Cir. 1973).............................44

*Port v. Heard*, 764 F.2d 423 (5th Cir. 1985) ........................................21

*Pretrial Services Agency for District of Columbia v. Sanders*,
780 F. Supp. 3d 286 (D.D.C. 2025) ................................................................ 34, 35

*Radin v. United States*, 699 F.2d 681 (4th Cir. 1983) ............................................44

*Reeside v. Walker*, 52 U.S. (11 How.) 272 (1850). .................................................33

*Republic National Bank of Miami v. United States*,
506 U.S. 80 (1992) .......................................................................... 26, 36, 37, 46

*Settles v. United States Parole Commission*, 429 F.3d 1098 (D.C. Cir. 2005) .......33

*State v. Danielson*, 809 P.2d 937 (Alaska Ct. App. 1991) .......................................34

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994) ......23

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012)........36

*United States v. Ballenger*, 811 F. Supp. 3d 123 (D.D.C. 2025).......... 11, 20, 31, 33

*United States v. Banuelos*, 763 F. Supp. 3d 1 (D.D.C. 2025)..................................32

*United States v. Benton*, 98 F.4th 1119 (D.C. Cir 2024) .........................................28

*United States v. Bergman*, 550 F. App'x 651 (10th Cir. 2013) ...............................49

*United States v. Coleman*, 458 F.3d 453 (6th Cir. 2006).........................................31

*United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997) (per curiam) ................48

*United States v. Forma*, 42 F.3d 759 (2d Cir. 1994) ...............................................35

*United States v. Friedman*, 849 F.2d 1488 (D.C. Cir. 1988) (per curiam)..............48

*United States v. Hansen*, 906 F. Supp. 688 (D.D.C. 1995) .....................................45

*United States v. Kahoe*, 134 F.3d 1230 (4th Cir. 1998)..........................................30

*United States v. Lewis*, 478 F.2d 835 (5th Cir. 1973).......................................... 34, 44

*United States v. MacGregor*, 617 F.2d 348 (3d Cir. 1980) .....................................30

*United States v. Padilla*, 387 F.3d 1087 (9th Cir. 2004) .........................................31

*United States v. Roberson*, 752 F.3d 517 (1st Cir. 2014) ........................................30

viii

*United States v. Schaffer*, 240 F.3d 35 (D.C. Cir. 2001) ............................................4

*United States v. St. Cyr*, 804 F. Supp. 3d 1 (D.D.C. 2025) ....................................10

*United States v. Stowell*, 133 U.S. 1 (1890)..................................................................48

*United States v. Sutton*, 2025 WL 2149396 (D.D.C. July 15, 2025)......................10

*United States v. Testan*, 424 U.S. 392 (1976).................................................................38

*United States v. Wallace*, 280 F.3d 781 (7th Cir. 2002).............................................31

*United States v. Windsor,* 570 U.S. 744 (2013)..................................................... 16, 17

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ...............................22

*Xi v. Haugen*, 68 F.4th 824 (3d Cir. 2023) ..................................................................50

**Statutes:**

18 U.S.C. § 922(g)(1)..............................................................................................30

18 U.S.C. § 981(a)(1)(C) .........................................................................................47

18 U.S.C. § 1512 ......................................................................................................47

18 U.S.C. § 1956(c)(7)(A) .......................................................................................47

18 U.S.C. § 1961(1) ..................................................................................................47

21 U.S.C. § 853 .........................................................................................................47

28 U.S.C. § 1346............................................................... 10, 37, 38, 39, 43, 45

28 U.S.C. § 2414.........................................................................................................7

28 U.S.C. § 2465 ................................................................................... 7, 47, 49

31 U.S.C. § 304 ..........................................................................................................7

31 U.S.C. § 1304 ............................................................................... 10, 15, 37

31 U.S.C. § 1322(b)(2)........................................................... 7, 9, 15, 45, 46

**Other Authorities:**

13C Wright & Miller's Fed. Practice & Procedure § 3533.4 (3d ed.).....................23

71 Comp. Gen. 464 (1992) ................................................................................46

Brief for Respondent Supporting Petitioners, *Hewitt*, 606 U.S. 419 (No. 23-1002), 2024 WL 4227053 ......................................................................................30

Opp. To Vacatur Mot., *United States v. Alberts*, No. 23-3123 (D.C. Cir. Jan. 23, 2025) .............................................................................................................25

Opp. To Vacatur Mot., *United States v. Brooks*, No. 24-3123 (D.C. Cir. Feb. 25, 2025) ...................................................................................................... 24, 25

Order, *United States v. Alberts*, No. 23-3123 (D.C. Cir. Jan. 24, 2025) .................25

Order, *United States v. Brooks*, No. 24-3123 (D.C. Cir. March 24, 2025) .............25

Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025)....................................4

*Restatement (Third) of Restitution and Unjust Enrichment* § 18 Comment e (A.L.I. 2024). .................................................................................................................32

Transcript of Oral Argument, *Hewitt v. United States*, 606 U.S. 419 (No. 23-1002) (2025) ...................................................................................................................30

# GLOSSARY

JA……………..Joint Appendix for Appellants Sullivan, Hager, Cua, and Kinnison

NLRB…………..…………….…..………………...National Labor Relations Board

SA ………………………….…………………….Supplemental Appendix for Amicus

SADF…………………………………...U.S. Marshal's Seized Asset Deposit Fund

VA ………………………….……………………Appendix for Appellant Vargas

## ISSUES PRESENTED

1. Whether the district court had jurisdiction to deny Appellants' motions for refunds where the government did not oppose them.

2. Whether an individual subject to a presidential pardon, whose conviction is vacated while pending appeal, is entitled to the return of criminal monetary penalties paid pursuant to his conviction.

3. Whether the Appropriations Clause bars a district court from ordering the return of such criminal monetary penalties, even if an entitlement exists.

4. Whether any other avenue of relief exists for Appellants in the current posture.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), amicus curiae states that all pertinent statutes and regulations are contained in the Joint Brief for Appellants Sullivan, Hager, Cua, and Kinnison and the Addenda to the Brief for Appellant Vargas.

## INTRODUCTION

For nearly 150 years, presidential pardon recipients have been precluded from receiving refunds of any money paid because of their pardoned conviction. That rule applies to every January 6 defendant who pleaded guilty and was later pardoned. It applies to January 6 defendants who were convicted at trial, whose convictions were affirmed on appeal, and who were subsequently pardoned. And it applies to these Appellants.

Appellants ask this Court to create an exception for them because they received their pardons before their criminal appeals were decided. The law does not permit such an exception, and this Court should treat Appellants the same as the other pardoned January 6 defendants.

This case arises in a unique posture; pardons before a criminal appeal becomes final are rare. But established pardon doctrine, methodical step-by-step analysis, and first principles all support affirming the judgments below.

There are two issues in this case, and though case law often mingles them, it is important to keep them separate. First, do these Appellants have a right to the money they paid the government? Second, if that right exists, does this Court have the power to provide a remedy? Appellants must prevail on both issues to warrant reversal. They prevail on neither.

1

Appellants lack a right to the funds. *Knote v. United States* established the baseline rule that a pardon does not bestow a right to refunds on a pardonee. 95 U.S. 149 (1877). Appellants' sole basis for distinguishing *Knote* is that the convictions here were vacated as moot. But their logic is circular: vacatur due to mootness assumes they had a right to the funds to begin with, so it assumes the conclusion to argue that mootness gives rise to an entitlement. Accordingly, the source of the right must be something *other* than the operations of mootness and vacatur. But none of Appellants' other proffered sources work. That leaves us with the tried-and-true *Knote* rule, which the district judges below correctly applied.

Even if Appellants have a *right* to the funds, they lack a remedy. The money they paid now sits in the U.S. Treasury. Money cannot be withdrawn from the Treasury without a valid appropriation. Although Appellants invoke various statutes constituting valid appropriations, Appellants' claims fall outside the scope of those statutes.

This Court should affirm the judgments.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

**Appellants' Convictions and Appeals**

Appellants John Sullivan, Bruno Cua, Stacey Hager, Derek Kinnison, and Hector Emmanual Vargas Santos were individually convicted and sentenced for crimes relating to their actions in or near the U.S. Capitol on January 6, 2021. Each was subject to varying terms of imprisonment and ordered to pay criminal monetary penalties. Sullivan was ordered to pay a $520 special assessment and to forfeit his interest in $90,875 that he had accrued by selling video footage of that day's events. JA41–42. Sullivan was also ordered to pay $2,000 in restitution, payable to the D.D.C. Clerk of Court for "disbursement to the following victims: Architect of the Capitol." JA41.

Cua, Hager, and Kinnison each were ordered to pay a special assessment and to pay restitution to the Architect of the Capitol. JA129; JA195; JA281. Vargas was ordered to pay a $70 special assessment, $500 in restitution to the Architect of the Capitol, and a $2,500 fine. JA333. Each appealed their conviction and sentence. JA43; JA131; JA197; JA283.

**The Presidential Pardons**

While Appellants' appeals were pending, President Trump issued a "a full, complete and unconditional pardon" for convictions "related to events that occurred

3

at or near the United States Capitol on January 6, 2021." Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025). The order directed that affected prisoners be "released immediately." *Id.* For January 6 defendants with cases still pending or on appeal, the Attorney General was ordered to "pursue dismissal with prejudice to the government of all pending indictments." *Id.*

The government accordingly moved to vacate Appellants' convictions due to mootness and remand for dismissal with prejudice. JA44–47, JA133–136, JA198–201, JA284–287. All five Appellants supported the government's motions. JA46 (Sullivan); JA135 (Cua); JA200 (Hager); JA286 (Kinnison); Mot. To Vacate, No. 23-3059, Doc. 29, at 3 (Vargas). In each case, this Court granted the government's motion, vacated the underlying conviction, and remanded with instructions to dismiss the case as moot. JA49; JA138; JA203; JA289 (all citing *United States v. Schaffer*, 240 F.3d 35 (D.C. Cir. 2001)). On remand, the District Court dismissed each case as moot. JA50; JA116; JA185; JA290; JA330.

**Appellants' Motions for Return of Money Paid or Seized**

After their criminal cases had been dismissed, Cua and Vargas contacted the D.D.C. Clerk of Court seeking a refund of the criminal assessments, restitution, and (in Vargas's case) fine they had paid. JA144; Vargas Appendix (VA) 34–36. The District Court's Finance Office declined the requests. As it explained, "[c]riminal debt, which includes special penalty assessments, fines, and restitution, paid to the

4

U.S. Government or to the victim(s) of a crime pursuant to a valid Judgment in a Criminal Case Order and prior to a pardon or dismissal is considered to be vested in a third party and therefore not available to be refunded." JA144; VA36 (citing *Knote v. United States*, 95 U.S. 149 (1877)). The Finance Office further explained that the assessments and fines had been "deposited in the Crime Victims Fund as mandated by 34 U.S.C. § 20101 and are no longer in the possession of the Judiciary." JA144; VA36. And the "restitution paid in this case was disbursed to the victim(s) prior to the pardon or dismissal. Accordingly, all criminal debt paid in this case is vested in a third party and is not eligible for a refund." JA144; VA36.

Each Appellant subsequently moved in the District Court for return of the monies they claimed they were owed. JA139–149 (Vargas); JA330 (Cua); JA204–209 (Kinnison); JA291–304 (Hager); JA44–47 (Sullivan).[1]

The government supported the motions. It conceded that Appellants were not entitled to a refund by virtue of their pardons alone. JA151; JA211 (citing *Knote*, 95 U.S. 149). But because Appellants also had their underlying convictions vacated and dismissed, the government contended that *Nelson v. Colorado*, 581 U.S 128 (2017), controlled. *See, e.g.*, JA331 (citing *Nelson* for the proposition that where "a criminal conviction is invalidated by a reviewing court and no retrial will occur… the State

---

[1] While the total forfeiture against Sullivan was $90,875, "only $62,813.76 actually was seized." Gov. Br. 4 n.2. Sullivan did not seek the return of the penalties and restitution he paid. *See* JA51–54.

[is] obliged to refund fees, court costs, and restitution exacted from the defendant"). In this "unusual situation," the government agreed that Appellants were entitled to a refund of all penalties. JA331. The government also agreed for similar reasons that Sullivan was entitled to a return of his forfeited account.

## II.    PROCEDURAL HISTORY

**Sullivan**

Before deciding Sullivan's motion, the District Court sought information about the location and custody of the forfeited funds. JA58–60. The government responded that the funds had been deposited into the U.S. Marshal's Seized Asset Deposit Fund (SADF), part of the U.S. Treasury. JA61–64.

Judge Lamberth denied Sullivan's motion. JA65. As he explained, the Constitution's Appropriations Clause directs that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. JA74. The Supreme Court held in *Knote* that funds deposited in the federal Treasury had "vested in the United States," and therefore a pardoned litigant could not recover them absent a congressional appropriation. JA69 (quoting *Knote*, 95 U.S. at 154). So too in Sullivan's case: When the FBI released the funds into the SADF, the money "vested in the United States." JA72.[2] Judge Lamberth explained

---

[2] The government argued that funds in the SADF were not the "property of the Federal government." JA74. Judge Lamberth "reject[ed] this invitation to endorse a

that it was irrelevant that Sullivan's conviction had been vacated on appeal. JA72. "All that matters is that funds may not be drawn from the Treasury without an appropriation." JA72. The government's reliance on *Nelson* accordingly was misplaced; the state penalties in *Nelson* never entered the federal Treasury. JA73.

The government also had compared Sullivan's case to those when a conviction is vacated during appeal after the defendant's death. JA73. But the death-vacatur cases suggested only that criminal financial penalties "must disappear as a formal matter when the underlying conviction disappears"; they did not "confront[] the Appropriations Clause implications" of vacatur. JA73.

Finally, Judge Lamberth rejected the argument that existing statutes counted as "appropriation[s]" under which Sullivan could recover the proceeds he forfeited. JA76. The government had cited 31 U.S.C. § 304 and 28 U.S.C. §§ 2414 and 2465(a). JA76. Judge Lamberth concluded that each ran aground on a simple fact: vacatur of Sullivan's conviction was not "tantamount to a judgment for [the] defendant." JA76–77.

**Kinnison**

Judge Lamberth's denial of Kinnison's motion built on his denial of Sullivan's. JA314–18. In Kinnison's case, the government also invoked 31 U.S.C.

---

legal fiction whereby some funds that are indisputably in the Treasury are considered not to be so for Appropriations Clause purposes." *Id.*

§ 1322(b)(2), "which allows the refund of 'moneys erroneously received' " by the Treasury. JA318. But as Judge Lamberth observed, the consequences of an offense "established by judicial proceedings" were "presumed to have been rightfully done and justly suffered." JA318 (quoting *Knote*, 95 U.S. at 153–154). The funds, then, were not "erroneously" received. JA318.

**<u>Vargas</u>**

Judge Moss denied Vargas's motion for a refund. VA41–50. He agreed with Judge Lamberth's reading of *Knote*, explaining that a pardon does not "affect any rights which have vested in others." VA45 (quoting *Knote*, 95 U.S. at 153–154). Money deposited into the Treasury vested in the United States such that the pardoned individual was not entitled to a refund absent congressional appropriation. VA45. Because Vargas's payments had been deposited into the Treasury,[3] Judge Moss concluded that Vargas was not entitled to a refund. VA47–48.

In rejecting Vargas's position that *Nelson* controlled, Judge Moss explained that *Nelson* dealt neither with a presidential pardon nor with the Appropriations Clause. VA46–47. Although Vargas's conviction, like Nelson's, had been vacated,

---

[3]  Judge Moss stated that all payments were deposited into the Crime Victims Restitution Fund within the U.S. Treasury. VA43. One clarification: The assessment and fine were deposited in the Crime Victims Fund. VA36. The restitution payment was "disbursed to the victim[ ]"—the Architect of the Capitol—"prior to the pardon or dismissal." VA36; *see Cua*, D.D.C. No. 21-cr-47, Dkt. 105-3 (same).

Judge Moss reasoned that "[t]he Court's power to order a refund does not turn on whether a defendant's conviction was vacated or not; it turns on whether the defendant is *entitled* to funds that were deposited into the U.S. Treasury before the pardon was granted." VA47. Under *Knote*, the answer was "no." VA48.

Judge Moss found the government's remaining arguments unpersuasive. He rejected the argument that the government lacked a vested right to the funds because the Architect of the Capitol was a government-entity victim. JA48. Judge Moss explained that the proper question under *Knote* was whether the funds had been deposited into the Treasury; here, they had. JA48. Judge Moss also rejected the government's argument that 31 U.S.C. § 1322(b) permitted refund of Vargas's payments "erroneously deposited," concluding that a pardon did not render a conviction "erroneous" such that Section 1322(b) permitted reimbursement. JA48.

**<u>Cua</u>**

Judge Moss denied Cua's motion on nearly identical grounds to Vargas. *See* JA154–162. Cua sought reconsideration, which the court denied. JA169.

**<u>Hager</u>**

Citing *Knote*, *Vargas-Santos*, and *Sullivan*, Judge Chutkan similarly concluded that the court "lack[ed] the authority" to order a refund of Hager's money as it had already vested in the Treasury. JA216.

9

**Related Cases**

Several other District Court judges have addressed similar motions for return of criminal penalties paid. For completeness, those decisions are summarized below.

**<u>Sutton and Zabavsky</u>**

In *United States v. Sutton*, 2025 WL 2149396 (D.D.C. July 15, 2025), Judge Friedman granted the defendants' motion in part. "[A]dopt[ing] in full" Judge Moss's opinion in *Vargas*, Judge Friedman determined that *Knote* precluded him from ordering the return of funds deposited into the Treasury. *Id.* at *2. But the D.D.C. Finance Office had not yet deposited $100 of Sutton's payment; it was still in judicial custody. Accordingly, Judge Friedman ordered that $100 refunded. *Id.*

**<u>St. Cyr</u>**

In *United States v. St. Cyr*, Judge Bates found a right to recover. 804 F. Supp. 3d 1 (D.D.C. 2025). Relying on *Nelson*, Judge Bates concluded that once a conviction is vacated, it must be treated as never having existed; and if the conviction never existed, the government was never permitted to take the defendant's money. *Id.* at 6–7.  Judge Bates concluded that he had authority under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), to enter judgment for the defendant's refund claim, and that the Judgment Fund, 31 U.S.C. § 1304(a), constituted a sufficient appropriation to pay that judgment. *Id.* at 10–12.

10

**Ballenger**

Chief Judge Boasberg took a different route to the same conclusion in *United States v. Ballenger*, 811 F. Supp. 3d 123 (D.D.C. 2025). He grounded the refund in what he described as the court's inherent equitable power to undo a vacated judgment. *Id.* at 130–31. Chief Judge Boasberg drew heavily on the analogy to defendants who die while their appeals are pending: "[I]n both cases, the defendants were convicted and appealed; then an event that had nothing to do with the conviction's merits . . . rendered the appeal moot." *Id.* at 129. Because mootness prevented the convictions from being tested on appeal, he concluded the government "cannot continue to deprive Defendants of the money those now-vacated convictions forced them to pay." *Id.* To satisfy the Appropriations Clause, Judge Boasberg held that the court's exercise of its inherent power to award a refund gave rise to a judgment "against the United States," which the Judgment Fund then authorized the government to pay. *Id.* at 130.

## SUMMARY OF ARGUMENT

**I.** The government argues that the District Court lacked Article III jurisdiction because it agrees with Appellants on the merits. But there remain adverse interests here. An order directing the Treasury to pay funds is a concrete injury to the federal fisc—and a concrete benefit to Appellants. Because Appellants asked the District

11

Court, and now ask this Court, to order the government to issue a refund that it would not (and could not) issue absent the order, Article III is satisfied.

On the merits, this case presents two issues: (1) do Appellants have a *right* to the funds, and (2) if so, do Appellants have a *remedy*, or does the Appropriations Clause preclude relief?

**II.** Appellants lack a right to the funds. To begin with, their claim depends exclusively on the fact that their convictions were vacated as moot while on appeal; that is their only basis for distinguishing this case from *Knote*. But their argument is circular. Take their argument step-by-step:

- Step 1: The criminal appeals were moot;

- Step 2: This means the convictions were vacated;

- Step 3: Because the appeals were mooted, the appellants could not test their convictions on appeal and obtain reversal;

- Step 4: As a result, it is unfair for the government to keep the money, so the appellants have a right to it.

Zoom in on that first step. An appeal is only moot if there is no remaining controversy. But that would be the case only if the pardons *automatically* entitled Appellants to their money back. In the alternative regime where the pardon does not give Appellants an automatic entitlement to the money, the appeals were not moot:

12

If they obtained reversal, they would get refunds—meaning they had a residual stake in the outcome of their appeals despite the pardons.

This means mootness depends on the antecedent question whether the appellants had a right to the money. Because mootness (and therefore vacatur) is the *result* of the right's existence, it cannot simultaneously be an *input* to decide whether that right exists in the first place. Returning to the steps outlined above, the appellants are using Step 4 (the existence of a right) as the justification for Step 1, and then in turn using Steps 2 and 3 (which depend on Step 1) to prove Step 4.

Because vacatur due to mootness cannot itself give rise to an entitlement to the funds, that entitlement must be found elsewhere. But there is nowhere to find it:

*Knote* explains that once a property right vests in someone else, the property no longer belongs to the defendant, and a pardon cannot change that fact. The same holds true here: the property right to money in the Treasury has vested in the United States. A pardon cannot reassign that property right; only an appropriation can.

*Nelson v. Colorado*, for its part, reasoned that a defendant is restored to their presumption of innocence upon the reversal of their conviction. Because the state cannot exact punishment upon an innocent person, the law entitles them to a refund of penalties. The same is not true with a vacatur due to a pardon. A pardon forgives the effects of a conviction; it does not render its recipient innocent. *Nelson* does not provide Appellants any basis for entitlement.

13

Neither does *Hewitt v. United States*. There, the Court concluded that a vacated sentence lacks prospective legal effect. Appellants read *Hewitt* to suggest that *all* follow-on effects of a now-vacated order are themselves erroneous. But the Court did not adopt a rule that treats past and future consequences of a vacated order as invalid. That very rule was disclaimed at oral argument; it also would contradict established precedent across numerous circuits.

Finally, equity affords no entitlement either. Even assuming an equitable claim is available here, Appellants' argument that equity "recognizes a right to a refund" ignores that even equitable rights must come from somewhere. Chief Judge Boasberg identified that source as the doctrine of unjust enrichment, and he ordered a refund on that basis. But this skipped a step: equity demands a refund only where it is *unjust* to allow the government to continue holding the funds. That may be so where a judgment is *reversed*; it is not so when it is vacated by reason of a pardon. An ordinary pardon recipient may not bring an unjust-enrichment claim against the government for funds exacted due to their pardoned conviction. It would be anomalous to reach a different result here based on the happenstance of when the pardon is issued.

**III.** Even if Appellants have a legal entitlement to the funds, they have no current remedy. The Appropriations Clause bars a court from ordering money drawn from the Treasury absent a lawful appropriation; once funds are deposited in the

14

Treasury, they may only be released through an act of Congress. So Appellants must identify a valid appropriation authorizing the return of the funds they paid. They cannot.

The Judgment Fund, 31 U.S.C. § 1304, is a general appropriation for the payment of final judgments, not an all-purpose judicial slush fund. As the Supreme Court explained in *Office of Personnel Management v. Richmond*, the Judgment Fund does not itself create any right to compensation; it merely supplies the source of funds once some other law validly authorizes the judgment. 496 U.S. 414, 432 (1990). Appellants cannot reason backward from the existence of the Judgment Fund to the existence of a payable claim; they must point to a separate statute authorizing the money judgment they seek.

The Little Tucker Act is jurisdictional; it operates as a limited waiver of sovereign immunity. The phrase on which Appellants rely—that the Act supplies jurisdiction for suits for money "improperly exacted or retained"—is a judge-made gloss this Court has described as protecting private property from illegal exactions. It does not cover money lawfully collected under valid criminal judgments. Every case Appellants cite as "consistent" practice involved convictions under unconstitutional statutes or statutes that never applied. None involved valid convictions, under valid statutes, vacated on mootness grounds after a pardon.

31 U.S.C. § 1322(b)(2) authorizes payments from the Treasury only where

15

the funds were "erroneously received." Appellants owed the money when they paid it. The subsequent vacatur of their convictions means only that those vacated orders are to be given no legal effect *going forward*.

28 U.S.C. § 2465 does not entitle Appellant Sullivan to his forfeited money. Again, title to forfeited assets vests in the government at the time of forfeiture. And Sullivan does not have a judgment entitling him to the return of his funds.

Finally, equitable principles do not provide relief. As explained, equity does not recognize an entitlement to these funds. But even if it did, equity cannot supply the appropriation the Constitution requires—the Judgment Fund is available only for judgments resting on a substantive right grounded in a specific statute, not on the basis of equity alone.

## ARGUMENT

### I.    THE DISTRICT COURT HAD JURISDICTION TO ISSUE THE CHALLENGED ORDERS.

The government contends that the District Court could exercise jurisdiction one way only: in its favor. According to the government, while the District Court apparently had jurisdiction to *order* refunds, it "lacked jurisdiction to enter orders prohibiting the refunds." Gov. Br. 2. That is not correct.

A case or controversy requires adverseness between the parties. *See, e.g., United States v. Windsor,* 570 U.S. 744, 758 (2013); *Muskrat v. United States*, 219 U.S. 346, 361 (1911). The government asserts that adverseness is absent where all

16

parties desire the same result. Gov. Br. 3–4. But as this Court has explained, adverseness exists even where parties desire the same outcome so long as "the parties have adverse interests, meaning that a judgment benefiting the plaintiff's concrete interests must adversely affect a concrete interest of the defendant." *Cortes v. NLRB*, 145 F.4th 57, 61 (D.C. Cir. 2025).

True, "[c]lassic adverseness is the push and pull of parties with opposing interests who offer disagreements to the court," *NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 400 (4th Cir. 2022). But adverseness remains intact even where the parties agree, so long as they "retain adverse *interests* in the litigation's outcome." *Id.* (citing *Windsor*, 570 U.S. at 756–759).

In *Windsor*, for example, the government ceased defending the constitutionality of a provision in the Defense of Marriage Act but declined to comply with a judgment ordering a tax refund to the plaintiff. 570 U.S. at 745–755. The Supreme Court concluded that Article III was nonetheless satisfied because the judgment "order[ed] the United States to pay money that it would not disburse but for the court's order." *Id.* at 758. The government thus "retain[ed] a stake sufficient to support Article III jurisdiction" because "[a]n order directing the Treasury to pay money is "a real and immediate" injury. *Id.* at 757–758. The fact that the government would "welcome" such an order would "not eliminate the injury to the national Treasury if payment is made." *Id.* at 758.

Conversely, Article III jurisdiction is lacking where a judgment in favor of the plaintiff would merely "maintain[] the status quo." *Constellium*, 43 F.4th at 404. Incorporating *Constellium*'s reasoning, this Court in *Cortes* held that Article III was not satisfied where the plaintiffs sought only a judgment that various NLRB removal protections were unconstitutional—a position with which the government agreed. 145 F.4th at 62–63. The *Cortes* plaintiffs did not ask this Court to "order the government to confer a benefit on them or to enjoin any governmental action affecting them." *Id.* at 62. Requesting that the court merely agree with both parties would therefore have no "real-world consequences." *Id.* at 63.

Here, however, a judgment *would* have real-world consequences. As Judge Moss explained in *Vargas*, "the United States has indicated that it requires a Court order to effectuate the payment and that it cannot act unilaterally." VA 43–44. And as in *Windsor*, the government's "welcom[ing]" of such an order here would not "eliminate the injury to the national Treasury" if it is ordered, nor to Appellants if it is not. *Id.* Therefore, despite the parties' agreement on the merits, there remains an adverse interest sufficient to support Article III jurisdiction.

## II.    THE INDIVIDUAL APPELLANTS HAVE NO RIGHT TO A REFUND OF THE CRIMINAL PENALTIES THEY PAID.

The decisions below all concluded that Appellants lacked a remedy because the Appropriations Clause bars the return of Treasury funds absent an appropriation. But there is a predicate question: Do Appellants have a *right* to a refund in the first

18

place? Appellants argue that they are entitled to a return of money paid because their convictions were vacated, but that logic is circular: it depends on mootness, which in turn depends on whether Appellants were entitled to the money in the first place. And with that prop removed, Appellants' case falls apart: a pardon does not create any rights, nor can it repatriate property that has vested in someone else.

This Court accordingly should hold that Appellants lack an entitlement to refunds, even before reaching the Appropriations Clause issue. "[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). Although Appellants invoke "constitutional avoidance" in trying to reconcile the Appropriations Clause and their cited statutes, *see* Joint Br. 32–33, the better application of constitutional avoidance is to hold that no entitlement exists in the first place.

### A. Vacatur Cannot Provide the Basis for the Right.

The linchpin of Appellants' argument is that they were unable to test their convictions on appeal because their appeals were mooted (and therefore vacated) because of a presidential pardon. But that assertion rests on circular logic.

Start with the baseline rule. A criminal defendant who is subsequently pardoned does not get back the criminal penalties they paid. *Knote*, 95 U.S. at 154; *see infra* at 25–27. Appellants and the government do not dispute that rule's

19

application to final convictions; they restrict their arguments to cases vacated while on appeal. *See* JA 151; 211; Gov. Br. 8–9 & n.8, 12; Joint Br. 13–15. Appellants are thus asking this Court to find an exception to the baseline rule. As support, Appellants argue that they "tried to test their convictions on appeal and could not" because their appeals were mooted and their convictions vacated, so they should be treated as if they were never convicted. Joint Br. 15, 18–19 (quoting *Ballenger*, 811 F. Supp. 3d at 129).

This last point is where Appellants go astray. As they correctly observe, if they had *any* monetary interest affected by their convictions that the pardons did not solve, their criminal appeals would not have been moot.[4] Joint Br. 17–18 (citing *Ellis v. Railway Clerks*, 466 U.S. 435, 442 (1984)). The Supreme Court announced that mootness principle over forty years ago in *Ellis*, and numerous circuits have applied it in contexts analogous to this case. *See, e.g.*, *Lorance v. Commandant, U.S. Disciplinary Barracks*, 13 F.4th 1150, 1153 (10th Cir. 2021) (pardon did not moot habeas petition where successful habeas claim would resolve conviction's collateral

---

[4] Appellants claim that because this Court dismissed their appeals as moot, this Court either "tacitly acknowledg[ed]" or impliedly assumed that the pardons entitled them to refunds. Joint Br. 18. But the refund issue was never mentioned. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). Nor should anyone have assumed refunds would be automatic; the clearest precedent on this issue suggests otherwise. *Knote*, 95 U.S. at 154.

consequences, including withholding of back pay); *Nakell v. Att'y Gen. of N.C.*, 15 F.3d 319, 322 (4th Cir. 1994) ("A possible refund of a fine has been held a collateral consequence constituting a sufficient stake in the outcome to prevent mootness" in a habeas case); *Port v. Heard*, 764 F.2d 423, 427 (5th Cir. 1985) (characterizing punitive fines as "direct consequence[s]" preventing habeas mootness).

The order of operations here thus is crucial. To decide whether Appellants' appeals were moot (and thus whether vacatur was proper), we first need to know whether they had any residual interest in the appeals' outcome *following the pardon*. That means we must ask whether the pardon itself entitled them to the fines being refunded. If yes, their appeals were indeed moot. But if the pardon did not itself entitle them to a refund, a live controversy still existed. Simply put, it is impossible to determine whether Appellants' appeals were moot without first resolving the antecedent question whether they had a right to the money.

But Appellants are citing vacatur premised on (alleged) mootness to *prove* that antecedent question. That logic is a perfect circle: Appellants' appeals were moot because the pardons entitled them a refund of the penalties they paid, and the reason they get a refund is because their appeals were vacated as moot. But that logic doesn't work without reference to some other principles—besides mootness and vacatur—about whether and why Appellants are entitled to a refund. The mootness-vacatur question depends on whether Appellants had a right to a refund to begin

21

with, so those principles cannot *also* inform the question of whether that right exists. *See, e.g.*, *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 361–362 (2013) (declining to consider argument that "assumes the answer to the central question at issue"). Instead, this Court should consider other factors to determine whether Appellants had a right to a refund of the criminal penalties they paid. *See infra* at 25–27. Only then can it be determined whether Appellants' direct appeals were actually moot, and whether Appellants could still have tested the validity of their convictions.

Appellants and the Government will point out that the appeals *were* dismissed as moot. But if the pardons did not automatically entitle Appellants to refunds, then dismissing their appeals as "moot" was error, and Appellants should have objected to the government's dismissal requests if they wished to preserve their right to seek refunds. But Appellants supported the government's requests. JA46 (Sullivan); JA135 (Cua); JA200 (Hager); JA286 (Kinnison); Mot. To Vacate, No. 23-3059, Doc. 29, at 3 (Vargas). Therefore, they waived their right to continue their appeals and recoup funds paid. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1053 (D.C. Cir. 2017). As Judge Moss explained, "[a]lthough Cua might have opposed dismissal of his appeal, so that he could continue to press his claim *on the merits* in the hope of

obtaining retrospective, make-whole relief, he did not do so."[5] JA168; *see also U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 25, 29 (1994) ("mootness by settlement does not justify vacatur" because "[t]he judgment is not unreviewable, but simply unreviewed by [Appellants'] own choice.").

Rather than being "unable" to test their convictions' validity, Appellants chose not to test their convictions.[6] They cannot use that choice to their advantage now; after all, if their appeals had continued and resulted in affirmance, they certainly would not get any money back. It would be illogical to hold that Appellants had no right to a refund at the time their appeals were dismissed as moot and their convictions vacated, but *now* the fact of vacatur—not premised on any merits determination—produces a new substantive right. Nevertheless, that is what appellants' position would allow.

Appellants also read *Schaffer* too broadly. When this Court dismissed as "moot" the pending January 6 appeals, it cited *Schaffer*, 240 F.3d 35. But the parties

---

[5] Judge Moss noted that Cua could seek a writ of error coram nobis now that his appeal has been dismissed. JA168. Amicus agrees that may be an available avenue to test the conviction's initial validity and seek relief from penalties paid.

[6] This is different from the case of a defendant dying mid-appeal. A dead person cannot choose to keep their appeal going. And "[a]lthough the language of mootness is often found in the opinions, the central concept is that the prosecution abates with the death of the defendant." 13C Wright & Miller's Fed. Practice & Procedure § 3533.4 (3d ed.). It is not mootness doing the work when a defendant dies mid-appeal; it is abatement.

23

in that case *agreed* that the appeal should be considered moot and dismissed, and there is no indication that the defendant sought any further judicial relief such as the return of money previously paid. *Id.* at 37–38. The dispute in *Schaffer* was only about what happens to the conviction itself after mootness is established on appeal: does it stay in place, as the government had argued there, or must it be vacated? *Id.* at 38. The court directed the latter approach. *Id. Schaffer* did not confront a situation where a defendant wishes to continue their appeal (despite being pardoned) to alleviate some other consequence stemming from the conviction. In that scenario, this Court should hold that a defendant may accept a pardon and its benefits while continuing their criminal appeal, if there are direct or collateral consequences the pardon did not resolve. *See Ellis*, 466 U.S. at 442; *Lorance*, 13 F.4th at 1153, 1165[7]; *Nakell*, 15 F.3d at 322.

To the extent that this Court has read *Schaffer* more broadly in the past, those decisions need not and should not control here. At least two other January 6 defendants *did* object to having their criminal appeals dismissed as moot. *See* Opp. To Vacatur Mot., *United States v. Brooks*, No. 24-3123 (D.C. Cir. Feb. 25, 2025); Opp. To Vacatur Mot., *United States v. Alberts*, No. 23-3123 (D.C. Cir. Jan. 23,

---

[7] *Lorance* even cited *Schaffer* for "the proposition that acceptance of a pardon does not constitute a waiver of appellate rights" because *Schaffer* explained that the pardon did not resolve the question of guilt, such that collateral consequences could still attach. *Lorance*, 13 F.4th at 1162.

24

2025). This Court overruled those objections and dismissed the cases in unpublished orders, citing *Schaffer* without discussion. Order, *Brooks*, No. 24-3123 (D.C. Cir. March 24, 2025); Order, *Alberts*, No. 23-3123 (D.C. Cir. Jan. 24, 2025). Those defendants, however, never pointed to an interest in obtaining a refund to argue against mootness. *See Brooks* Opp. 3 (invoking defendant's desire to "establish his innocence"); *Alberts* Opp. 2, 10 (gesturing at unspecified "collateral consequences" and the need to "correct bad case law"). In any event, those nonprecedential orders do not bind this Court, and they should not have prevented Appellants from making their own objections.

The bottom line is that whether Appellants are entitled to refunds is an antecedent question to mootness (and thus vacatur). That means vacatur itself cannot serve as a justification for their right to the funds. This Court should first determine whether that right exists independently. As we next explain, it does not.

## B. The Pardons Did Not Give Appellants a Right To Refunds.

As a preliminary matter, it is important to be disciplined about the source of any potential right. Appellants have not identified a particular cause of action or source of an affirmative legal right to a return of the criminal penalties they paid; they maintain only that the government *lacks* a right to that money. Joint Br. 15. But their right has to come from somewhere. Statutes like the Judgment Fund do not create rights; they provide a remedy in certain circumstances. *See infra* at 37–38.

And implied causes of action are disfavored. *See, e.g.*, *Egbert v. Boule*, 596 U.S. 482, 491 (2022); *Alexander v. Sandoval*, 532 U.S. 275, 286–287 (2001). So where does the right to the money come from?

*1. Not from the pardon itself.*

A pardon itself does not bestow any affirmative rights. The Court in *Knote* explained that if a defendant pays restitution to a third party and is later pardoned, the defendant has no right to return of the restitution paid: "The rights of the parties have become vested." 95 U.S. at 154. A pardon does not reassign a property right; it does not (and cannot) "affect any rights which have vested in others." *Id.* A pardon "releases the offender from the consequences of his offence," but once property exacted from an offender has vested in another, "those rights cannot be impaired by the pardon." *Osborn v. United States*, 91 U.S. 474, 477 (1875). This same principle applies when the money is transferred from the defendant to the United States: "if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States." *Knote*, 95 U.S. at 154; *see also Republic National Bank of Miami v. United States*, 506 U.S. 80, 94 (1992) (Rehnquist, J., for the Court) ("[O]nce funds are deposited into the Treasury, they become public money").

*Knote* accordingly reaffirmed the principle that a pardon itself does not create a new entitlement to property once that property has vested in another party. *Knote*, 95 U.S. at 154. Instead, once vested in the Treasury, that property interest belongs

26

to the United States and may only be assigned back to the pardoned party if Congress makes a valid appropriation. *Id. Knote* thus did not hold merely that the Appropriations Clause blocks the *remedy* owed to a pardonee; it held that a pardoned defendant *has no right to begin with*, and the federal government can bestow such a right only through a valid appropriation.

All this is precisely the logic relied on by the judges below. *See, e.g.*, VA45 (Vargas); JA72 (Sullivan); JA317 (Kinnison). Additionally, Judge Moss observed that "the statute at issue in *Knote* did not require a criminal conviction at all, and there is no indication that Knote himself was ever convicted of treason." VA47 (citing *Knote*, 95 U.S. at 149–152, and *Knote v. United States*, 10 Ct. Cl. 397, 398 (1874)). And if people "who were never convicted of a crime are not entitled to a return of their property following a pardon, then it stands to reason that the same rule applies to individuals whose convictions were vacated" after a pardon. *Id.*

*2. Not from* Nelson.

The Court's decision in *Nelson* does not provide a path to entitlement, either. *Nelson* held that where a state-court conviction is subsequently reversed on appeal, a state may not retain the funds exacted as a result of that erroneous conviction. *Nelson*, 581 U.S. at 135. But as Judge Moss explained, the vacatur of a conviction "alone does not trigger *Nelson's* rule." VA46–47. When a defendant's conviction is reversed, "the presumption of their innocence [is] restored." *Nelson*, 581 U.S. at 135.

The presumption of innocence makes it is unjust for the state to retain a monetary punishment exacted against that defendant. *Id*. at 136.

But "a pardon does not, standing alone, render [defendants] innocent." *Schaffer*, 240 F.3d at 38. Indeed, the Pardon Attorney himself explained as much: "The pardon means that you're forgiven, *but you still have a criminal conviction.*" SA7 (emphasis added); *see also United States v. Benton*, 98 F.4th 1119, 1129 (D.C. Cir 2024) ("under the modern understanding of a Presidential pardon's effect, it 'does not blot out guilt' or create a factual fiction that conviction never occurred" (quoting *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994))). It is permissible to exact punishment against a defendant who is adjudged guilty. And it is similarly permissible to decline to restore funds to a pardon recipient who is "forgiven," but who "still ha[s] a criminal conviction." *See* SA7. Regardless of when a pardon is received, then, the result is the same: the recipient is not treated as though their conviction was reversed outright, and they do not receive the benefits of a restored presumption of innocence.

*3. Not from* Hewitt*.*

The Supreme Court's recent decision in *Hewitt v. United States*, 606 U.S. 419 (2025), does not change this analysis. In *Hewitt*, the Court considered whether a defendant's sentence, vacated after the enactment of the 2018 First Step Act, "has been imposed" for purposes of § 403(b) of that Act. *Id.* at 427. The Court concluded

28

that a vacated sentence "has not been imposed" under that provision because vacated sentences are "void *ab initio* and thus lack any prospective legal effect." *Id.* at 431.

Appellants interpret the "void *ab initio*" statement in *Hewitt* to say much more. To them, vacatur rewinds the clock: once a judgment is vacated, every consequence ever imposed because of the conviction is void because "the law acts as though the vacated order never occurred." Joint Br. 31 (quoting *Hewitt*, 606 U.S. at 431).

This cannot be what the *Hewitt* Court meant. *Hewitt* held that vacatur eliminates the "*prospective legal effect*" of the vacated conviction: A criminal defendant with a vacated conviction "is to be treated *going forward* as though he were never convicted." 606 U.S. at 431 (emphases added). That all makes good sense; if a conviction is vacated, subsequent proceedings should treat the vacated conviction as having no legal effect.

Appellants interpret *Hewitt* to stand for a far more radical proposition, arguing that vacatur *retrospectively* unwinds any follow-on consequence of the now-vacated conviction. Joint Br. 31. After a defendant's conviction is vacated, Appellants' argument goes, courts should act as though the defendant never had the conviction "as a historical fact"—such that any penalty premised on the now-vacated conviction

29

is itself erroneous, even if imposed before vacatur. *See id.* at 31–32 (quoting *Hewitt*, 606 U.S. at 432).[8]

Even Hewitt's own counsel did not go that far. The government in *Hewitt* had raised concerns that a broad "void *ab initio*" vacatur principle that rendered the conviction "'void from the start' for all purposes" would upend numerous areas of law, such as convictions for felons in possession of a firearm where the predicate felony is later vacated. Br. for Resp. Supporting Pets., *Hewitt*, 606 U.S. 419 (No. 23-1002), 2024 WL 4227053, at *26 n.4. When Hewitt's counsel was asked about those concerns at oral argument, counsel reassured the Justices that "what we mean is that it is treated as void *ab initio* prospectively." Oral Argument Tr. 16–17, *Hewitt* (No. 23-1002); see also *id*. at 46–47 (Assistant to the Solicitor General, in support of Hewitt, agreeing).

Numerous circuits also have long upheld the validity of convictions that relied on later-vacated predicate offenses, such as for felons in possession of firearms under 18 U.S.C. § 922(g)(1) or failure to register as a sex offender. *See, e.g.*, *United States v. Roberson*, 752 F.3d 517, 522 (1st Cir. 2014); *Burrell v. United States*, 384 F.3d 22, 27–28 (2d Cir. 2004); *United States v. MacGregor*, 617 F.2d 348, 349 (3d Cir. 1980); *United States v. Kahoe*, 134 F.3d 1230, 1235 (4th Cir. 1998); *United*

---

[8] This reading is also the foundation for Appellants' circular mootness-entitlement argument, which employs the same maximalist reading of "void *ab initio*" to produce a right to the refunds. *See* supra at 19–21; Joint Br. 15–16.

*States v. Coleman*, 458 F.3d 453, 456 (6th Cir. 2006); *United States v. Wallace*, 280 F.3d 781, 784 & n.1 (7th Cir. 2002); *United States v. Padilla*, 387 F.3d 1087, 1090–91 (9th Cir. 2004). It would be strange indeed for the Supreme Court to have silently overruled at least seven circuits' worth of precedent.

### 4. Not from Some Equitable Penumbra.

Appellants (but not the Government) also argue that general principles of equity may serve as a source of their entitlement, claiming that equity "recognizes a right to a refund." Joint Br. 21, 24. But again, an equitable entitlement needs to come from *somewhere*, and the question is where.[9]

In all the similarly situated January 6 cases, only Chief Judge Boasberg invoked equitable principles in locating an entitlement to the funds. *Ballenger*, 811 F. Supp. 3d at 130–131. He posited that the reason courts order the return of money after a judgment is *reversed* on appeal is that the party holding the money is "holding money that is not rightfully hers." *Id.* at 131. An order to repay the funds in those circumstances thus "avoid[s] unjustly enriching" the possessor. After concluding that the "vacatur of Defendants' convictions" places them in the same position, he ordered the refund. *Id.* at 132.

---

[9] A defendant pardoned *after* having his conviction affirmed on appeal has no "unjust enrichment" claim against the government for funds exacted as a result of the pardoned conviction. Appellants are thus seeking another bespoke exception to another established rule. *See supra* at 19–20, 26–27.

31

But this skips a step. Even assuming the government now holds money that does not belong to it, *but see supra* at 25–31, the proper inquiry becomes whether it would be *unjust* to allow the government to continue to do so. *Atlantic Coast Line R. Co. v. Florida*, 295 U.S. 301, 309 (1935) (restitution is not owed "of mere right," and need not be ordered "where the justice of the case does not call for it"). When a judgment is vacated but not reversed on the merits, an unjust-enrichment claim for money paid pursuant to the now-vacated judgment fails where there was "a sufficient legal basis in the underlying liability." *Restatement (Third) of Restitution and Unjust Enrichment* § 18 Comment e (A.L.I. 2024). Only where a conviction was *wrong* on the merits is it unjust not to order repayment. That is where equity kicks in.

On these facts, it is not "unjust" for the government to retain the funds. Again, as opposed to a reversal restoring a party to innocence, *see Nelson*, 581 U.S. at 144, vacatur by reason of a pardon does not negate guilt. *Burdick v. United States*, 236 U.S. 79, 91 (1915). And though a pardon and vacatur may prevent the *prospective* imposition of further punishment based on the vacated conviction, it does not change the "truth of what happened on January 6, 2021." *United States v. Banuelos*, 763 F. Supp. 3d 1, 1 (D.D.C. 2025). Even the Pardon Attorney noted that Appellants "*still have a criminal conviction*," SA7; they are not innocent of the crimes they committed, and the government still sustained real damage as a result of their conduct.

32

Even if some equitable penumbra could provide an entitlement to Appellants, moreover, the argument fails for an independent reason: The government has not waived its sovereign immunity to this sort of equitable claim. Without a waiver, the default rule is that courts have no authority to hear money claims against the government. This immunity is capacious: "The sovereignty of the government not only protects it against suits directly, but against judgments even for cost, when it fails in prosecutions." *Reeside v. Walker*, 52 U.S. (11 How.) 272, 288–89 (1850).

Chief Judge Boasberg concluded that sovereign immunity "does not stand in the way" of an equitable entitlement because "the Government went after Defendants." *Ballenger*, 811 F. Supp. 3d at 132. Because the Court had authority to "order Defendants to pay" in the first place, Chief Judge Boasberg reasoned, "it can order those payments reversed." *Id.* This analysis is incomplete for three reasons.

First, as *Ballenger* itself recognized, the government "cannot waive its sovereign immunity through litigation conduct." *Id.* Nor is "federal sovereign immunity . . . waived by appearance" in court. *Settles v. United States Parole Commission*, 429 F.3d 1098, 1105 (D.C. Cir. 2005). Waivers "must be unequivocally expressed in statutory text." *Id.* at 1105. Amicus is aware of no statute waiving federal sovereign immunity with respect to equitable claims, and the *Ballenger* decision identifies none. On the contrary, the Court of Claims cannot grant equitable relief. *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). That is because

the Tucker Act does not waive immunity for equitable claims. *Id.* at 914 (Scalia, J., dissenting) (collecting sources).

Second, the cases *Ballenger* invoked are inapposite. One was a dispute between two private parties. *See Nw. Fuel Co. v. Brock*, 139 U.S. 216 (1891). Two were cases where criminal convictions were subsequently invalidated either by a writ of coram nobis or by reversal. *United States v. Lewis*, 478 F.2d 835, 836 (5th Cir. 1973); *Ex parte McCurley*, 412 So.2d 1236, 1237 (Ala. 1982). And the last concerned a sentence adjustment based on an "illegally assessed fine"—a fine that was invalid at the time it was imposed. *State v. Danielson*, 809 P.2d 937, 939 (Alaska Ct. App. 1991). Recall that a vacatur is different from substantive invalidations like reversals, *see supra* at 27–31, in that it operates *prospectively*: A vacated order may not have been *wrong*, yet it will be treated going forward as if it "never occurred." *Hewitt*, 606 U.S. at 431. This distinction makes a real difference.

Third, the closest doctrinal analogy to *Ballenger*'s waiver-by-prosecution theory does not support its conclusion. Courts have recognized a limited waiver of sovereign immunity in a practice called "recoupment" whereby defendants, when the federal government initiates a civil action, may assert a counterclaim "to defeat or diminish the sovereign's recovery." *Pretrial Services Agency for District of Columbia v. Sanders*, 780 F. Supp. 3d 286, 291 (D.D.C. 2025). But this does not amount to a general waiver of immunity for *any* potential counterclaim unrelated to

34

the relevant transaction or occurrence. *Id.* at 291–92. When a particular counterclaim is permitted, it may only reduce or eliminate the party's liability to the government. *Id.* at 292. No "affirmative adverse judgment" may be rendered against the government. *United States v. Forma*, 42 F.3d 759, 764 (2d Cir. 1994). Moreover, this limited exception "does not extend to criminal prosecutions." *Sanders*, 780 F. Supp. 3d at 291.

In sum, there is no route to recovery under Appellants' equitable theory, either. Equitable principles do not recognize a viable right of action in this case, and even if they did, the government would be immune from liability.

Finally, even if this Court concludes that a refund may be ordered in the trial court's equitable discretion *and* that the United States is not immune from such a claim, the proper remedy is a remand. The judges from whom these appeals arose did not apply their equitable discretion, and a remand would provide each an opportunity to consider the equitable factors appropriate to each individual.

## III.    THE CONSTITUTION BARS ANY REFUND ABSENT CONGRESSIONAL APPROPRIATION.

Even assuming Appellants possess some underlying entitlement to the return of funds held in the Treasury, entitlement does not itself authorize payment. A court still may not order money drawn from the Treasury without an appropriation made by Congress.

The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Clause is "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). Its purpose is to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–428 (1990).

The Supreme Court applied this principle over a century and a half ago in *Knote*, holding that once the proceeds of forfeited property have been paid into the Treasury, "they can only be secured to the former owner of the property through an act of Congress." 95 U.S. at 154. The Court reaffirmed and extended this principle over a century later in *Republic National Bank*, explaining that "the principle that once funds are deposited into the Treasury, they become public money—and thus may only be paid out pursuant to a statutory appropriation—would seem to transcend the facts of *Knote*." 506 U.S. at 94. More recently still, this Court reaffirmed the same point. *See North*, 62 F.3d at 1435–36 (explaining that "the Constitution [and] *Knote* . . . forbid" the court from "authoriz[ing] payment from the Treasury" without "congressional authorization").

36

Thus, even where a party has a right to money currently held in the Treasury, an appropriation is still required before that money can be withdrawn. The question then is—again, assuming Appellants are entitled to a refund—whether any current appropriation exists that could serve as a source for the refund. The answer is no.

## A. The Judgment Fund

The individual Appellants (but not the government) contend that they are entitled to a remedy by way of the Judgment Fund, 31 U.S.C. § 1304, which provides a general appropriation for "final judgments" against the United States. Joint Br. 20–21; Vargas Br. 59. As the Supreme Court has explained, however, the Judgment Fund is a "general appropriation for payment of judgments," not an "all-purpose fund for judicial disbursement." *Richmond*, 496 U.S. at 432. Funds "may be paid out only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *Id.* This means Appellants still must identify a specific statute supplying the substantive right before they can tap into the Judgment Fund. *Id.*; *see also Republic Nat'l Bank*, 506 U.S. at 94–95 (requiring identification of a statute providing a "substantive right to compensation" before funds could be withdrawn from the Treasury under § 1304).

## B. The Little Tucker Act

The individual Appellants (but not the Government) contend that the Little Tucker Act, 28 U.S.C. § 1346, supplies the necessary authority for a return of the

criminal penalties they paid because this case involves money "improperly exacted or retained." Joint Br. 26; Vargas Br. 60. That argument also fails.

**1.    The Little Tucker Act Supplies Jurisdiction Over Claims For Violation of the Constitution, A Statute, Or A Regulation.**

The Little Tucker Act gives federal district courts concurrent jurisdiction with the Court of Federal Claims over certain civil actions against the United States not exceeding $10,000. 28 U.S.C. § 1346(a)(2). The Little Tucker Act thus is a jurisdictional statute—and only that. *United States v. Testan*, 424 U.S. 392, 398 (1976). It does not itself create a substantive right to money damages. *Id.* at 400. So a plaintiff seeking to bring a claim for monetary damages under the Little Tucker Act must identify a separate statute, regulation, contract, or constitutional provision that can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* at 400.

The Supreme Court reaffirmed that principle in *Army & Air Force Exchange Service v. Sheehan*, 456 U.S. 728 (1982), explaining that Tucker Act jurisdiction cannot be premised on "the asserted violation of regulations that do not specifically authorize awards of money damages." *Id.* at 739. *Sheehan* rejected an attempt to repackage alleged regulatory violations as an implied-contract theory, warning that to accept such reasoning would "undermine" the rule that Tucker Act relief exists

38

only where money claims against the United States have been properly authorized. *Id.* at 740.

*Richmond* confirms as much: the Judgment Fund is designed to "pay judgments against the United States rendered under its various authorizations for suits against the Government, such as the Tucker Act." 496 U.S. at 431. But a plaintiff invoking jurisdiction under the Little Tucker Act still needs to establish entitlement to relief under an appropriate substantive statute. *Id.*

Appellants argue that courts may exercise jurisdiction under the Little Tucker Act over claims for money "improperly exacted or retained." Joint Br. 26.

To begin with, that phrase is a judicial gloss; it appears nowhere in the statute itself. The Little Tucker Act specifies that federal district courts have concurrent jurisdiction with the Court of Federal Claims over

> (1) Any civil action against the United States for the recovery of *any internal-revenue tax* alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected *under the internal-revenue laws*; [and]
>
> (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort [with certain exceptions not relevant here].

28 U.S.C. § 1346 (emphases added). The Act's provision for "erroneous," "wrongful[ ]" or "illegal" collection thus pertains exclusively to federal tax laws—

39

nothing else. That leaves the Act's second provision, which grants jurisdiction over claims for money damages "founded either upon" the Constitution, a law, a regulation, or (irrelevant here) certain contractual agreements, as the foundation for Appellants' claim to money they claim was "improperly exacted or retained."

The Constitution itself can't be the source of Appellants' remedy; "courts have uniformly held that jurisdiction under the 'founded upon the constitution' grant of the Tucker Act is limited to claims under the 'takings clause' of the Fifth Amendment." *Clark v. Library of Congress*, 750 F.2d 89, 103 n.31 (D.C. Cir. 1984) (citing cases). [10]

That leaves a federal statute or regulation. But Appellants identify no such statute or regulation authorizing a refund of criminal penalties upon vacatur of a conviction (and we have found none). Instead, they argue that vacatur *itself* created a present right to the money; and for all the reasons discussed above, it did not.

This Court's decision in *Kizas v. Webster* is instructive. There, this Court explained that the "improperly exacted or retained" language "is simply a recognition that the Tucker Act protects private property from illegal government

---

[10] Appellant Vargas (but not the others) argues that retaining the special assessment, restitution, and fine constitutes a taking of his "property." Vargas Br. 46–49. This claim depends on the existence of a property right. And for all the reasons discussed, none exists. A claimed entitlement to a refund, without more, does not itself create a property interest. *See Kizas*, 707 F.2d at 539–540.

levy." 707 F.2d 524, 538 n.74 (D.C. Cir. 1983). That phrase—"illegal government levy"—is key; damages are recoverable only where "the relevant provisions so authorize." *Id.*

Federal Circuit cases demonstrate the same understanding. In *Norman v. United States*, the court explained that an "illegal exaction" involves money "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1007–09 (Ct. Cl. 1967)). To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant thus must demonstrate "that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Id.* (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)). An illegal-exaction claim requires showing both that the government lacked legal authority to take the money and that the law it violated contemplates giving it back.

*Clapp v. United States* further illustrates the point. There, the agency demanded money as a condition of approving a ship transfer—without any statutory authority to impose that charge. 117 F. Supp. 576, 580–581 (Ct. Cl. 1954). That is a true illegal exaction; the government's demand was unauthorized when made. By contrast, here the government did not impose criminal fines, assessments, restitution,

41

or forfeiture without legal authority. It collected those penalties pursuant to judgments that were fully operative and lawful when entered and when paid.

The Supreme Court itself drew the distinction between a later-arising restitutionary claim after reversal and money illegally exacted from the start. In *Bank of the United States v. Bank of Washington*, 31 U.S. (6 Pet.) 8 (1832), the Court addressed money paid under a judgment that was later reversed (not just vacated), explaining that the reversal "cannot have a retrospective operation, and make void that which was lawful when done." *Id.* at 19. Instead, reversal gave rise to a "new right or cause of action" to obtain restoration of what was lost by reason of the erroneous judgment—a subsequent obligation running between the parties to the judgment.[11] *Id.* The Court contrasted that situation with true illegal exaction: "[w]here money is wrongfully and illegally exacted, it is received without any legal right or authority to receive it; and the law, at the very time of payment, creates the obligation to refund it." *Id.* at 19.

*Bank of the United States* thus recognizes that some later-arising entitlement to restitution does not mean the original payment was unlawful when made. Any

---

[11] *Bank of the United States* predated the Tucker Act and involved private parties, not a claim against the federal Treasury. Any restitutionary right it recognized arose from reversal and ran between the parties to the judgment—not from a claim seeking return of Treasury funds after a vacatur that merely rendered the appeal moot. *See supra* at 27–31 (distinguishing reversals from vacaturs). Appellants' equitable theory against the government fails for the reasons explained *supra* at 31–35.

42

obligation to restore the money may arise only later, at time two; an illegal exaction exists at time one. Here, the criminal penalties were paid while the underlying judgments were lawful and in force. Even assuming Appellants now have some right to seek compensation, *but see supra* at 18–35, that does not establish that the government effected an "illegal exaction." Any such later-arising claim would need to rest on some independent source of law; vacatur alone does not convert a lawful payment into an "illegal" exaction within the meaning of the Little Tucker Act.

### 2. Appellants' Cases Are Inapposite.

Appellants' heavy reliance on *Nelson* and *Hewitt* is misplaced. As explained, *Nelson* does not establish an entitlement to a refund on these facts. *See supra* at 27–28. Nor does it help Appellants on the remedy side; *Nelson* did not involve the Appropriations Clause, the Treasury, or the scope of a civil waiver of sovereign immunity. And *Hewitt* concerned only whether a vacated sentence "has been imposed" for purposes of a federal sentencing statute—a holding limited to prospective legal effect. *See supra* at 28–31. Neither addressed the Little Tucker Act or the meaning of the judge-made phrase "improperly exacted or retained."

Appellants also cite a series of cases allegedly reflecting a "consistent" practice that should have been followed here. Joint Br. 26–27. Those cases indeed are consistent, but none of them is apposite.

43

*United States v. Lewis* arose from the grant of a writ of error coram nobis and concerned fines imposed under a wagering-tax statute later determined to be unconstitutional. 478 F.2d 835, 836 (5th Cir. 1973). The court treated repayment as incident to the writ and declined to channel the defendant-payor into a separate Tucker Act suit to recover the fines it had paid as the "unlawful result of the conviction," pursuant to an "unconstitutional statute." *Id.* So *Lewis* involved a conviction that was constitutionally invalid from the beginning.

*Pasha*, *DeCecco*, and *Neely*—cited by Appellants and the *St. Cyr* court—all arose from the same unconstitutional statutory scheme at issue in *Lewis*. *Pasha* and *DeCecco*, like *Lewis*, arose from an application for writ of error coram nobis and involved penalties "collected without authority . . . under the internal-revenue laws." *Pasha v. United States*, 484 F.2d 630, 631–633 (7th Cir. 1973); *DeCecco v. United States*, 485 F.2d 372, 373–374 (1st Cir. 1973). And *Neely v. United States*, 546 F.2d 1059, 1061 (3d Cir. 1976) was a civil case grounded on the same unconstitutional wagering-tax laws.[12] The remaining case reflects the same pattern: In *United States*

---

[12] *Neely* characterized the wagering-tax refund claim as "founded upon the Constitution," thus triggering Tucker Act jurisdiction, because the underlying conviction violated the Fifth Amendment. 546 F.2d at 1063–64. Subsequent decisions take a narrower view: "jurisdiction under the 'founded upon the constitution' grant of the Tucker Act is limited to claims under the 'takings clause' of the Fifth Amendment." *Clark*, 750 F.2d at 103 n.31. *See also Radin v. United States*, 699 F.2d 681, 685 n.8 (4th Cir. 1983) (due process claim not cognizable under Tucker Act); *Duarte v. United States*, 532 F.2d 850, 852–853 (2d Cir. 1976) (same);

*v. Hansen*, the court granted a writ of error coram nobis after the Supreme Court overruled the statutory interpretation on which the defendant's conviction rested. The court concluded that the conviction "is, and always was invalid." 906 F. Supp. 688, 697 (D.D.C. 1995).

All these cases, then, involved paradigmatic time-one illegality. And the fact that all these cases arise from (or are related to) writs of error coram nobis is telling. They show that a court granting that extraordinary writ—a remedy for fundamental defects in a conviction's initial validity, *see supra* at 23 n.5—has on occasion recognized a refund power grounded in the Little Tucker Act as an accompaniment to that writ. But they quite plainly do not establish that the Little Tucker Act is available to Appellants, whose convictions *were* valid at time one.

## C. 31 U.S.C. Section 1322(b)(2)

Appellants and the Government all contend that monetary penalties deposited pursuant to convictions vacated while pending appeal are "erroneously received" such that 31 U.S.C. § 1322(b)(2) authorizes their return. Joint Br. 31–32; Vargas Br. 58–59; Gov. Br. 21–23. Section 1322(b)(2) is a "permanent indefinite appropriation" that allows the Treasury to correct erroneous deposits; without it, money deposited in error would remain "public funds" that could only be returned by act of Congress.

---

*Feathergill v. United States*, 217 Ct. Cl. 24, 32–33 (Ct. Cl. 1978) (same for First Amendment claim).

*See Republic National Bank*, 506 U.S. at 94. The statute has been read to make funds available only where depositors were ordered to pay money "contrary to law." *Lee v. United States*, 33 Fed. Cl. 374, 382 (1995). That is, money is payable under Section 1322(b)(2) when it becomes clear "on subsequent inspection, that the *original* receipt of those funds took place contrary to law." *Id.* (emphasis added).

For example, in one proceeding before the Comptroller General, the SEC used statutory discretion to waive a company's liability for which it had already paid the penalty. 71 Comp. Gen. 464, 466 (1992). This second-in-time determination rendered the penalty "erroneously received" *only* because the discretionary authority conferred by the statute allowed it to "alter the substantive right of the Commission" to receive the fine in the first place. *Id.* But it was only because the statute granted the authority, at time two, to retroactively change whether the money was legally owed at time one that § 1322(b)(2) allowed recovery.

Section 1322(b)(2) provides no remedy for Appellants. Every criminal penalty paid here was pursuant to sentences valid and in effect when the fines were paid. The government argues that "erroneous" deposits include funds "collected but later determined to be legally unsupported," Gov. Br. 23 n.15, but that is not the case here. To be clear: Appellants owed the money when they paid it; the payment remains as legally supported now as it was then. The subsequent vacatur of Appellants' convictions means only that, as of the vacatur, a court may not consider

46

their past conviction and sentence *going forward*. *See supra* at 28–31; *Hewitt*, 606 U.S. at 431. Because the money was validly owed when paid, it was not "erroneous" for the government to receive it.

### D. 28 U.S.C. Section 2465

The Government and Sullivan argue that Sullivan's forfeited profits from selling video footage of January 6 are payable to him pursuant to 28 U.S.C. § 2465, which provides that "property shall be returned" "[u]pon the entry of a judgment for the claimant in any proceeding to condemn or forfeit property." Joint Br. 28–30; Gov. Br. 7–8, 13–21. That is not correct.

The federal government can seek forfeiture of personal property "which constitutes or is derived from proceeds traceable" to an offense that falls into the category of "specified unlawful activity." 18 U.S.C. § 981(a)(1)(C). "Specified unlawful activity" includes "any act or activity constituting an offense listed" in 18 U.S.C. § 1961(1). *Id.* § 1956(c)(7)(A). And Title 18 lists an act indictable under Section 1512—Sullivan's statute of conviction—as one such offense. *Id.* § 1961(1).

Criminal forfeiture proceedings follow the procedures set out in 21 U.S.C. § 853. *Id.* Section 853 provides that "[a]ll right, title, and interest in property . . . vests in the United States upon the commission of the act giving rise to forfeiture." *Id.* § 853(c). This provision "reflects the application of the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United

47

States, at the time of the criminal act giving rise to forfeiture." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 627 (1989).

As the Supreme Court explained in *Caplin & Drysdale*, the forfeiture "took effect" when the defendant committed the violation, and once "judicial condemnation . . . perfect[ed] it," that forfeiture "operated from [the time of the violation] as a statutory conveyance to the United States of all the right, title, and interest" held originally by the defendant. *Id.* at 627 (quoting *United States v. Stowell*, 133 U.S. 1, 19 (1890)). The government's title "was as valid and effectual, against all the world, as a recorded deed." *Id.* (quoting *Stowell*, 133 U.S. at 19). *See also United States v. Friedman*, 849 F.2d 1488, 1490–91 (D.C. Cir. 1988) (per curiam) (reaching same conclusion).

The upshot: Title vested in the United States upon payment. It remains with the United States. This would be a different case if Sullivan had continued his appeal and obtained a reversal of his conviction: A reversal, and the accompanying judgment in favor of the defendant, may generate an entitlement to a refund under Section 2465. *See, e.g.*, *United States v. DeFries*, 129 F.3d 1293, 1312 (D.C. Cir. 1997) (per curiam) ("Because we reverse appellants' RICO convictions, the accompanying forfeitures must also be reversed."). Judge Lamberth is correct that "vacatur of a judgment against a criminal defendant . . . is not tantamount to a judgment for that defendant." JA77; *see also United States v. Bergman*, 550 F.

48

App'x 651, 655 (10th Cir. 2013) (district court vacating judgment was not "entry of judgment" for defendant). But like the other Appellants, Sullivan waived any argument against mootness and now cannot get the judgment that Section 2465 requires. Sullivan instead must find a remedy in some other statute; and he has identified none that provides the remedy he seeks.

### E. Equitable Principles Do Not Circumvent the Need for an Appropriation.

In the end, Appellants are left, again, to appeal to equity. *See* Joint Br. 21, 24. But as explained, equity alone is not sufficient to reverse. At the threshold, equitable principles do not entitle Appellants to the funds. *See supra* at 31–35. And even if equity did give rise to an entitlement, Appellants must still identify an appropriation from which the refund would be paid, and equity alone cannot supply what the Appropriations Clause requires: "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Richmond*, 496 U.S. at 426 (quoting *INS v. Pangilinan*, 486 U.S. 875, 883 (1988)). As discussed, the Judgment Fund authorizes payment only on the basis of a judgment resting on a substantive right to compensation grounded in the terms of a specific statute. *Id.* at 432. *See supra* at 37.

\* \* \*

Ultimately, Appellants have neither a right nor a remedy. A pardon does not give someone a right to refunds, and the other purported sources of their right to the

funds all fail. And even if Appellants *did* have a right to a refund of criminal penalties, "[n]ot all rights have remedies." *Xi v. Haugen*, 68 F.4th 824, 828 (3d Cir. 2023); *see Egbert*, 596 U.S. at 491–492; *Hernandez v. Mesa*, 589 U.S. 93, 114–115 (2020). The Appropriations Clause blocks the remedy Appellants seek in these proceedings.

There could conceivably exist other paths to a lawful remedy: Appellants might seek writs of coram nobis to challenge their convictions on the merits. *See supra* at 23 n.5. They might lobby Congress for a special appropriation, in accord with the Appropriations Clause. But the relief cannot come by this route.

## CONCLUSION

For the foregoing reasons, the judgments below should be affirmed.

Respectfully submitted,

*/s/ Catherine E. Stetson*

CATHERINE E. STETSON
*Counsel for Amicus Curiae*

May 11, 2026

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing Brief for Amicus Curiae in Support of the Judgment Below complies with the word limit of Fed. R. App. P. 32(a)(7)(B)) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,127 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Catherine E. Stetson*

CATHERINE E. STETSON
*Counsel for Amicus Curiae*

May 11, 2026

**CERTIFICATE OF SERVICE**

I, Catherine E. Stetson, certify that, on May 11, 2026, a copy of the foregoing

Brief of Amicus Curiae in Support of the Judgment Below was filed with the Clerk

through the Court's electronic filing system.

I further certify that all parties required to be served have been served.

*/s/ Catherine E. Stetson*

CATHERINE E. STETSON
*Counsel for Amicus Curiae*

May 11, 2026

53